SEALED

**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2015 DEC -1  AM 8: 26

DEPUTY CLERK_____

UNITED STATES OF AMERICA

v.

SINA ATHARI (2)
CAROLINA GISELLE BERRIO (4)
    a.k.a. "Carolina Slocum Berrio"
    a.k.a. "Karrie"
ANGELA MOORE BOOTH (5)
GLENDA CANE (7)
LASHAVIA SHYNEICE DENSON (8)
    a.k.a. "Shae Denson"
    a.k.a. "Shay Denson"
JASON EDGECOMBE (9)
DARLENE VIOLA FORTENBERRY
(10)
BERTHA ALICIA GARCIA (11)
WILLIAM HOPKINS (13)
    a.k.a. "New York"
FAHIM AHMED KHAN (14)
CANDIS O'SHAEA LEWIS (15)
FNU LNU (16)
    a.k.a. "Patrick Moore"
    a.k.a. "Crowley"
IVERY MYERS (17)
TANEISHA NICOLE NICKERSON (18)
    a.k.a. "Nookie"
SHALISA SHAUNTA ROBINSON (20)
    a.k.a. "Shalisa Speed"
MARKII JOSETT SHULAR (21)
TASMIN JAMAL STEWART (22)
    a.k.a. "Taz"
CY VIATOR (24)
RICHARD ANDREWS (25)
ADRIAN BANKS (26)
BRANDON DUNBAR (27)
MUHAMMAD FARIDI (28)

**FILED UNDER SEAL**

No. 3:15-CR-044-D

[supersedes indictment returned February 3, 2015]

First Superseding Indictment - Page 1

KUMI FRIMPONG (29)
NDUFOLA KIGHAM (30)

The Grand Jury Charges:

## Introduction

At times material to this Indictment:

1.     The Controlled Substances Act ("CSA"), 21 U.S.C. § 801 et seq. and its implementing regulations in 21 C.F.R. §1301 et seq., governs the possession, manufacture, distribution, dispensing, administering, and prescribing of controlled substances within the United States.    With limited exceptions for medical professionals, the CSA makes it "unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" or conspire to do so.

2.     The CSA and its implementing regulations sets forth which drugs and other substances are defined by law as "controlled substances," and those controlled substances are assigned to one of five schedules (Schedule I, II, III, IV, or V), depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

3.     The CSA and its implementing regulations classify oxycodone as a Schedule II controlled substance.    Oxycodone is the generic name for a narcotic analgesic that is also sold under a variety of brand names such as Roxicodone and Oxycontin.    Oxycodone is also referred to by the street names as "oxys" and "roxis," among others.    Oxycodone, when legally prescribed and supplied by a licensed

practitioner for a legitimate medical purpose in the usual course of professional practice, is used to treat moderate to severe pain.   Oxycodone is a widely abused narcotic that is frequently diverted from legitimate medical channels and sold to drug abusers.

4.     The CSA and its implementing regulations classified hydrocodone as a Schedule III controlled substance when combined with a non-narcotic (such as acetaminophen) in a therapeutically recognized amount before October 6, 2014.   On October 6, 2014, hydrocodone became a Schedule II controlled substance. Hydrocodone is the generic name for a narcotic analgesic that is also sold under a variety of brand names such as Vicodin, Norco, and Lortab.   Hydrocodone is also referred to by the street names "hydros," "vics," "norcos," and "tabs," among other names.   When legally supplied by a licensed practitioner for a legitimate medical purpose in the usual course of professional practice, hydrocodone is used to combat moderate pain. Hydrocodone is a widely abused narcotic that is frequently diverted from legitimate medical channels and distributed to drug abusers.

5.     Medical practitioners, including doctors, nurse practitioners, pharmacies, and pharmacists, authorized to possess, manufacture, distribute, or dispense controlled substances by the jurisdiction in which that medical practitioner is licensed, are authorized under the CSA to dispense controlled substances if they are registered with the Attorney General of the United States.   Such medical practitioners and pharmacies are assigned a registration number with the Drug Enforcement Administration ("DEA").

6.      Even if authorized in his jurisdiction and registered with the DEA, 21

C.F.R. §1306.04(a) prohibits a medical practitioner from issuing a prescription for a

controlled substance unless the prescription is "issued for a legitimate medical purpose by

an individual practitioner acting in the usual course of his professional practice."    The

regulation further states:    "The responsibility for the proper prescribing and dispensing

of controlled substances is upon the prescribing practitioner, but a corresponding

responsibility rests with the pharmacist who fills the prescription.    An order purporting

to be a prescription issued not in the usual course of professional treatment or in

legitimate and authorized research is not a prescription within the meaning and intent of

[the CSA] and the person knowingly filling such a purported prescription, as well as the

person issuing it, is subject to the penalties provided for violations of the provisions

relating to controlled substances."

7.      **Sina Athari, Carolina Giselle Berrio, Angela Moore Booth, Glenda**

**Cane, Lashavia Shyneice Denson, Jason Edgecombe, Darlene Viola Fortenberry,**

**Bertha Alicia Garcia, William Hopkins, Fahim Ahmed Khan, Candis O'Shaea**

**Lewis, FNU LNU a.k.a. "Patrick Moore," Ivery Myers, Taneisha Nicole Nickerson,**

**Shalisa Shaunta Robinson, Markii Josett Shular, Tasmin Jamal Stewart, Cy Viator,**

**Adrian Banks, Brandon Dunbar**, and **Muhammad Faridi**, defendants, are not medical

practitioners authorized in any capacity in the state of Texas to distribute or dispense

controlled substances, are not registered with the Attorney General of the United States,

do not possess DEA registration numbers, and are not authorized under the CSA to manufacture, distribute, or dispense Schedule I, II, III, IV, or V controlled substances.

8. **Richard Andrews**, defendant, is a doctor of osteopathy licensed in the state of Texas and is a co-owner and supervising physician of McAllen Medical Clinic on South Hampton in Dallas, Texas. **Richard Andrews** is registered with the Attorney General of the United States and possesses a DEA registration number that authorizes him to issue a prescription for Schedule II, III, IV, and V controlled substances so long as the prescription is issued for a legitimate medical purpose by him in the usual course of his professional practice.

9. **Kumi Frimpong**, defendant, is a pharmacist licensed in the state of Texas and is the owner, operator, and pharmacist in charge of Cornerstone Pharmacy located on Bolton Boone in Desoto, Texas. **Kumi Frimpong** is registered with the Attorney General of the United States, and possesses a DEA registration number that authorizes him to dispense Schedule II, III, IV, and V controlled substances pursuant to a prescription so long as the prescription is issued for a legitimate medical purpose by him in the usual course of his professional practice.

10. **Ndufola Kigham**, defendant, is a pharmacist licensed in the state of Texas and is the owner, operator, and pharmacist in charge of GenPharm Pharmacy located on Wheatland Road in Desoto, Texas. **Ndufola Kigham** is registered with the Attorney General of the United States, and possesses a DEA registration number that authorizes her to dispense Schedule II, III, IV, and V controlled substances pursuant to a

prescription so long as the prescription is issued for a legitimate medical purpose by a medical practitioner acting in the usual course of his or her professional practice.

Count One
Conspiracy to Distribute a Controlled Substance
(21 U.S.C. § 846)

OBJECTS OF THE CONSPIRACY

11.     Paragraphs one through ten are realleged and incorporated here.

12.     Beginning in or around January 2013 and continuing through on or about July 2014, the exact dates being unknown, in the Dallas Division of the Northern District of Texas and elsewhere, **Sina Athari, Carolina Giselle Berrio, Angela Moore Booth, Glenda Cane, Lashavia Shyneice Denson, Jason Edgecombe, Darlene Viola Fortenberry, Bertha Alicia Garcia, William Hopkins, Fahim Ahmed Khan, Candis O'Shaea Lewis, FNU LNU a.k.a. "Patrick Moore," Ivery Myers, Taneisha Nicole Nickerson, Shalisa Shaunta Robinson, Markii Josett Shular, Tasmin Jamal Stewart, Cy Viator, Richard Andrews, Adrian Banks, Brandon Dunbar, Muhammad Faridi, Kumi Frimpong**, and **Ndufola Kigham**, defendants, did knowingly, intentionally, and unlawfully combine, conspire, confederate and agree together and with each other, and with other persons both known and unknown to the Grand Jury, to commit an offense against the United States, to wit:

a.  To possess with intent to distribute, distribute, and cause to be distributed a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, without a legitimate

medical purpose and not in the usual course of professional practice, in

violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); and

b.  To possess with intent to distribute, distribute, and cause to be

distributed a mixture and substance containing a detectable amount of

hydrocodone, a Schedule III controlled substance, without a legitimate

medical purpose and not in the usual course of professional practice, in

violation of 21 U.S.C. § 841(a)(1) and (b)(1)(E).

### MANNER AND MEANS

13.    The objects of the conspiracy were to be accomplished in the following

manner and means:

14.    It was part of the conspiracy that individuals, often homeless or of limited

means, were recruited to pose as patients at certain medical clinics to obtain prescriptions

for controlled substances, including oxycodone and hydrocodone, and fill those

prescriptions at designated pharmacies;

15.    It was further part of the conspiracy that the recruits would be paid a fee,

such as $30, to pose as patients to go to clinics and pharmacies;

16.    It was further part of the conspiracy that the recruiter would organize the

recruits so that another individual, such as a driver, would pick them up and transport

them to and from the clinics;

17.     It was further part of the conspiracy that the recruiters would be paid a small fee, such as $15 per person, for each individual they recruited by the driver or the script ring leader;

18.     It was further part of the conspiracy that the driver, script ring leader, or another co-conspirator such as someone associated with the clinic, would coach the recruit on what to say inside the clinic to obtain the specified prescription;

19.     It was further part of the conspiracy that the driver or script ring leader would pay for the recruit's visit to the clinic, either by giving the recruit money to pay the clinic or by paying the clinic directly;

20.     It was further part of the conspiracy that the specified clinics would refuse to accept insurance or Medicaid from recruits seeking pain medications, such as oxycodone, and instead charge a recruit approximately $125 to several hundred dollars in cash per medical visit;

21.     It was further part of the conspiracy that the specified clinics would attempt to minimize the possibility of detection by law enforcement by limiting patients to recruits accompanied by known and trusted drivers;

22.     It was further part of the conspiracy that the specified clinics would attempt to maximize profit by providing the prescriptions sought by the script ring leaders, such as 30mg oxycodone;

23.     It was further part of the conspiracy that the specified clinics would provide oxycodone prescriptions by hiring medical practitioners willing to write them even

though the clinic owners, managers, and practitioners knew they were not issued for a legitimate medical purpose in the usual course of professional practice;

24.     It was further part of the conspiracy that the driver or script ring leader would transport the recruits and prescriptions, or would cause the prescriptions alone to be transferred, to designated pharmacies so that the prescriptions would be filled;

25.     It was further part of the conspiracy that the drivers or script ring leaders would pay for the prescriptions at the pharmacies and obtain the controlled substances that the pharmacies dispensed;

26.     It was further part of the conspiracy that the designated pharmacies refused to accept insurance or Medicaid in payment for pain medications, such as hydrocodone, and instead only accepted cash payments;

27.     It was further part of the conspiracy that the driver would deliver the controlled substances to the script ring leader;

28.     It was further part of the conspiracy that co-conspirators, from the clinic owners and managers, to script ring leaders, to drivers, and recruits, would conceal and assist others to conceal the illicitly-issued nature of the prescriptions, the quantities of controlled substances obtained and distributed, and drug proceeds to avoid detection by law enforcement officers; and

29.     It was further part of the conspiracy that the script ring leaders would distribute and dispense, and possess with intent to distribute and dispense, oxycodone and hydrocodone, in Texas and elsewhere.

## OVERT ACTS

30.     In furtherance of the conspiracy and to accomplish the objects of the conspiracy, **Sina Athari, Carolina Giselle Berrio, Angela Moore Booth, Glenda Cane, Lashavia Shyneice Denson, Jason Edgecombe, Darlene Viola Fortenberry, Bertha Alicia Garcia, William Hopkins, Fahim Ahmed Khan, Candis O'Shaea Lewis, FNU LNU a.k.a. "Patrick Moore," Ivery Myers, Taneisha Nicole Nickerson, Shalisa Shaunta Robinson, Markii Josett Shular, Tasmin Jamal Stewart, Cy Viator, Richard Andrews, Adrian Banks, Brandon Dunbar, Muhammad Faridi, Kumi Frimpong**, and **Ndufola Kigham**, defendants, and others known and unknown to the Grand Jury, committed the following overt acts in the Dallas Division of the Northern District of Texas and elsewhere:

31.     In or about January 2013, **Muhammad Faridi** joined **Richard Andrews** in the operation of McAllen, a pill mill located on South Hampton Road in Dallas, Texas, involved in the illicit distribution of prescriptions for controlled substances, namely oxycodone.

32.     Shortly thereafter, Andrews agreed to sell McAllen to **Faridi**.    The terms of sale involved **Muhammad Faridi** making payments in increments over time to **Richard Andrews** and **Richard Andrews** continuing to see patients at McAllen.

33.     In or about February 2013, **Muhammad Faridi** made his first payment of $25,000 to **Richard Andrews** to buy McAllen.    The payment came from the cash-only

fees collected from recruits posing as patients to obtain controlled substances, including 30mg oxycodone tablets, during the first month that McAllen was open in 2013.

34.     On or about January 14, 2014, **Richard Andrews** agreed to sell the real property located on South Hampton Road, Dallas, Texas, from which McAllen operated to **Muhammad Faridi**.

35.     **Richard Andrews** and **Muhammad Faridi** together own, manage, and operate McAllen in the manner described above in paragraphs 14 through 29.

36.     **Richard Andrews** wrote and issued prescriptions for 30 mg oxycodone pills without conducting medical exams, for which he knew there was no legitimate medical purpose, and outside the usual course of professional practice.

37.     **Muhammad Faridi** managed McAllen, which included ensuring script ring leaders had access to McAllen and could obtain the prescriptions they sought. **Faridi** also filled out prescriptions for 30 mg oxycodone pills and then obtained **Andrews's** signature on them knowing that there were no legitimate medical purposes for any of the prescriptions and that **Andrews** was not acting in the usual course of professional practice.

38.     Between January 2013 and July 2014, the exact dates being unknown, **Richard Andrews** and **Muhammad Faridi**, together and with each other and with other persons both known and unknown to the Grand Jury, distributed and caused to be distributed at least 150,000 30mg oxycodone pills, a Schedule II controlled substance, through McAllen, by issuing prescriptions knowing that the prescriptions had not been

issued for a legitimate medical purpose by a medical practitioner acting in the usual course of professional practice.

39.    **Kumi Frimpong** owns and operates Cornerstone in the manner described above in paragraphs 14 through 29 and knowingly filled invalid prescriptions issued by **Richard Andrews**.

40.    Between January 2013 and July 2014, the exact dates being unknown, **Kumi Frimpong**, with other persons both known and unknown to the Grand Jury, distributed and dispensed from Cornerstone Pharmacy at least 40,000 30mg oxycodone pills, a Schedule II controlled substance, by filling prescriptions written by **Richard Andrews** at McAllen, knowing that the prescriptions for these pills had not been issued for a legitimate medical purpose by a medical practitioner acting in the usual course of professional practice.

41.    **Ndufola Kigham** owns and operates GenPharm in the manner described above in paragraphs 14 through 29 and knowingly filled invalid prescriptions for 30mg oxycodone that had been issued by **Richard Andrews**.

42.    Between January 2013 and July 2014, the exact dates being unknown, **Ndufola Kigham**, with other persons both known and unknown to the Grand Jury, distributed and dispensed from GenPharm Pharmacy at least 70,000 30mg oxycodone pills, a Schedule II controlled substance, by filling prescriptions written by **Richard Andrews** at McAllen, knowing that the prescriptions for these pills had not been issued

for a legitimate medical purpose by a medical practitioner acting in the usual course of professional practice.

43.    On or about May 24, 2013, in Dallas, Texas, a car was rented in the name of an individual known to the Grand Jury (hereinafter "T.C.") that Cornelius Robinson and **Shalisa Robinson** drove to Louisiana to distribute oxycodone.

44.    On or about May 25, 2013, in St. Martin's Parish, Louisiana, Cornelius Robinson and **Shalisa Robinson** possessed approximately 1,543 oxycodone pills, consisting of 1,161 30mg oxycodone pills and 382 15mg oxycodone pills.   These pills were dispensed by **Kumi Frimpong**, based on prescriptions issued in **Richard Andrews's** name, and delivered to T.C. by **Muhammad Faridi**.

45.    On or about August 8, 2013, **Fahim Khan** and **Bertha Garcia** met with an undercover task force officer of the Drug Enforcement Administration ("UC-1") at a medical clinic in Channelview, Texas, and **Fahim Khan** told UC-1 that he could not get 30mg oxycodone but could get 10mg oxycodone.

46.    On or about August 8, 2013, UC-1 paid the clinic $420 but never met with a practitioner and no one conducted a legitimate medical examination of UC-1.

47.    On or about August 8, 2013, **Bertha Garcia** met UC-1 at a gas station in Jacinto City, Texas, and delivered a prescription for 90 10mg oxycodone pills.

48.    On or about August 14, 2013, at The Bridge Homeless Shelter in Dallas, Texas, **William Hopkins** recruited an individual acting as a confidential informant for

the Drug Enforcement Administration ("CS-1") to pose as a patient and go to McAllen in Dallas, Texas, to obtain prescriptions for controlled substances.

49.     On or about August 14, 2013, at McAllen, T.C. gave CS-1 $130 to pay for the medical visit.   CS-1 paid McAllen but never met with a practitioner and did not get a medical examination.

50.     On or about August 14, 2013, T.C. instructed CS-1 to say he has back pain, wants oxycodone and hydrocodone, and has seen the doctor here for four months.

51.     On or about August 14, 2013, T.C. paid CS-1 $30 for going to McAllen and told him that he would get another $40 to go to the pharmacy the next day.   **Kumi Frimpong** later filled that prescription.

52.     On or about October 14, 2013, **Kumi Frimpong** called T.C. to discuss filling oxycodone prescriptions and minimizing detection by law enforcement.   T.C. told **Frimpong** that T.C. expected to bring **Frimpong** ten prescriptions to fill this week signed by **Richard Andrews** of McAllen.   T.C. said the prescriptions may be dated a few weeks ago, and **Frimpong** expressed concern that someone in severe pain who needs oxycodone does not typically wait two weeks to fill a prescription.

53.     On or about October 18, 2013, T.C. asked **Kumi Frimpong** to open up for a few minutes.   **Frimpong** agreed and reiterated that the prescriptions should be dated the day they are presented to **Frimpong** or within two days.   T.C. responded that he did not know if the dates had been written on the prescriptions yet.

54.    On or about October 21, 2013, T.C. organized obtaining controlled substances in Dallas, Texas, transporting them to Baton Rouge, Louisiana, and distributing them.

55.    On or about October 21, 2013, T.C. agreed to pay **Markii Shular** $220 per day to courier oxycodone pills to Baton Rouge and distribute them to T.C.'s customers.

56.    On or about October 21, 2013, T.C. hired **Candis O'Shaea Lewis** to drive **Markii Shular** to Dallas-Fort Worth International Airport so that she could fly to Baton Rouge, Louisiana.

57.    On or about October 22, 2013, **Markii Shular**, acting at the direction of T.C., flew from Dallas-Fort Worth International Airport to Baton Rouge, Louisiana, with approximately 800 oxycodone pills to distribute.

58.    On or about October 22, 2013, at a hotel in Baton Rouge, Louisiana, **Markii Shular**, following T.C.'s instruction, distributed approximately 235 oxycodone pills to **Tasmin Stewart**, one of T.C.'s customers.

59.    On or about October 28, 2013, **Kumi Frimpong** and T.C. discussed filling prescriptions for oxycodone.   T.C. told **Frimpong** that he intended to obtain 80 prescriptions per week and that **Muhammad Faridi** advised T.C. to spread the prescriptions among several pharmacies, including Cornerstone and GenPharm, to avoid setting off an alarm to DPS.   **Frimpong** responded that if T.C. had 16 prescriptions now, **Frimpong** could fill them.

First Superseding Indictment - Page 15

60.    On or about October 30, 2013, in Dallas, Texas, T.C. instructed Tonya Sue Griggs to recruit new individuals to pose as patients to obtain prescriptions for hydrocodone from McAllen.

61.    On or about October 30, 2013, Tonya Griggs told T.C. that she had the recruits.

62.    On or about October 31, 2013, T.C. told Tonya Griggs he would pay her $15 per recruit.

63.    On or about October 31, 2013, in Dallas, Texas, **Candis Lewis**, while acting at T.C.'s direction, picked up the recruits from Tonya Griggs and transported them to McAllen.

64.    On or about October 31, 2013, T.C. instructed **Candis Lewis** to tell the recruits to go inside McAllen, say their backs hurt, and that they need hydrocodone.

65.    On or about October 31, 2013, T.C. told **Candis Lewis** to pay the recruits $40 each when they leave McAllen and drive them home.

66.    On or about October 31, 2013, in Dallas, Texas, T.C. negotiated sending controlled substances to **Sina Athari** in Austin, Texas, specifically, approximately 80 hydrocodone pills for $320.

67.    On or about November 5, 2013, T.C. and **Sina Athari** discussed building the customer base in Austin, Texas, and pricing of oxycodone pills.

68.    On or about November 7, 2013, **Kumi Frimpong** contacted T.C. to obtain the names of recruits T.C. would use to obtain prescriptions so that **Frimpong** could

check them in the Texas Department of Public Safety Prescription Monitoring Program to make sure that prescriptions for oxycodone had not been filled in their names too recently.

69.     On or about November 14, 2013, in Dallas, Texas, **Cy Viator** and T.C. conspired to obtain 600 10/650 hydrocodone pills and 2,000 oxycodone 30mg pills in Dallas, Texas, and distribute them in Lafayette and Scott, Louisiana.    The prescriptions had been issued by **Richard Andrews** and controlled substances dispensed by **Kumi Frimpong**.

70.     On or about November 14, 2013, **Cy Viator** drove T.C. to a FedEx location in Dallas where T.C. shipped two packages containing 600 10/650 hydrocodone pills and 2,000 oxycodone 30mg pills to Lafayette, Louisiana, and Scott, Louisiana.    T.C. identified the sender on each package as **Brandon Dunbar**.

71.     On or about November 14, 2013, **Cy Viator** provided T.C. with both package recipients' names and addresses.    One of the packages was addressed to **Cy Viator** on Landry Street, Scott, Louisiana.

72.     On or about November 15, 2013, while T.C. and **Kumi Frimpong** are discussing the seizure of the 600 10/650 hydrocodone pills and 2,000 oxycodone 30mg pills in Louisiana, **Frimpong** speculates that someone could have given law enforcement a hint about the package and asks T.C. what to do now.

73.     On or about December 13, 2013, **Lashavia Denson** went to a pharmacy in Abilene, Texas, to obtain controlled substances.

74.     On or about December 13, 2013, acting at Cornelius Robinson's direction, **Lashavia Denson** obtained 120 30mg oxycodone pills from the pharmacy in Abilene, Texas, by presenting a prescription issued that day by a doctor in Houston, Texas, for a resident of Houston, Texas.

75.     On or about December 15, 2013, **Brandon Dunbar** contacted Cornelius Robinson to obtain 30 mg oxycodone pills because **Brandon Dunbar** had a customer who wanted 400 to 500 30mg oxycodone pills and **Brandon Dunbar** had agreed to sell them for $35 per pill.

76.     On or about December 16, 2013, Earl Cain provided Cornelius Robinson with the names and birth dates of two individuals, one of whom was **Darlene Fortenberry**, whom Earl Cain had recruited to enable Robinson to obtain controlled substances from pharmacies for which the recruit had no legitimate medical need.

77.     On or about December 16, 2013, Cornelius Robinson agreed to pay **Darlene Fortenberry**, who lives in Houston, Texas, $220 to go on a day trip to an out-of-town pharmacy to fill a prescription.

78.     On or about December 17, 2013, **Darlene Fortenberry** contacted Cornelius Robinson to remind him that she was one of Earl Cain's recruits and to give Cornelius Robinson her location in Houston so Cornelius Robinson could meet her.

79.     On or about December 17, 2013, Cornelius Robinson drove **Darelene Fortenberry** to a pharmacy in Temple, Texas.

80.     On or about December 17, 2013, **Darlene Fortenberry**, acting at Cornelius Robinson's direction, obtained 120 30mg oxycodone pills.

81.     On or about December 18, 2013, **Carolina Giselle Berrio** told Cornelius Robinson, her supplier, that she needed pills.

82.     On or about December 18, 2013, **Carolina Giselle Berrio** and Cornelius Robinson negotiate the price and place of delivery of pills.    Cornelius Robinson asks a higher price to deliver the oxycodone to **Carolina Giselle Berrio** in Lafayette, Louisiana, and a lower price if **Berrio** picks up the pills in Houston.

83.     On or about December 18, 2013, **Robinson** agreed to supply **Carolina Giselle Berrio** with oxycodone at $18.50 per pill, and **Carolina Giselle Berrio** agreed to pick up the pills from in Houston.

84.     On or about January 8, 2014, Cornelius Robinson instructed Shane Barron how to interact with a pharmacist to get three prescriptions for controlled substances filled at one time.

85.     On or about January 8, 2014, Cornelius Robinson further instructed Barron to empty the pills out of the bottles they came in after the prescriptions were filled. Cornelius Robinson further recommended that Shane Barron install a false compartment in his car large enough to conceal three firearms.    Cornelius Robinson further said that he recommended T.C. install one in his car and that **Cy Viator** already had false compartments in his car.

First Superseding Indictment - Page 19

86.     On or about January 8, 2014, Cornelius Robinson estimated that he would have 750 pills and more scripts to fill when Shane Barron returned and asked Shane Barron if he could sell 1025 pills.

87.     Beginning at least as early as February 10, 2014, and continuing through at least March 6, 2014, **Glenda Cane** stored and distributed both oxycodone and hydrocodone pills supplied by Cornelius Robinson.

       i.   On or about February 14, 2014, Cornelius Robinson told **Glenda Cane** to quote $22 per oxycodone 30mg pill and $5 per hydrocodone pill to a customer when a particular customer contacted her.

      ii.   On or about February 14, 2014, **Glenda Cane** contacted **Robinson** to let him know a different customer contacted her to buy oxycodone and hydrocodone and to confirm the price of hydrocodone.

    iii.   On or about February 21, 2014, to keep **Robinson** informed as to her cash and pill balance, **Glenda Cane** told Cornelius Robinson that she had $2350 and was down to approximately 40 to 41 pills and would need more.

     iv.   On or about February 26, 2014, **Glenda Cane** told Cornelius Robinson she had $1435 and 52 pills left.

      v.   On or about February 27, 2014, **Glenda Cane** told Cornelius Robinson she had $2672 and was out of pills.

88.     On or about February 18, 2014, Cornelius Robinson found more than 100 pills in his kitchen.

89.     On or about February 18, 2014, **Shalisa Robinson** recommended that Cornelius Robinson sell the pills he found for $25 each because no one had any pills, and Cornelius Robinson agreed.

90.     On or about February 18, 2014, Cornelius Robinson described finding a bottle with 154 pills in his kitchen as $3,000 of free money to Shane Barron.

91.     On or about February 18, 2014, Cornelius Robinson agreed to distribute 640 pills to **FNU LNU, a.k.a. "Patrick Moore."**

92.     On or about February 18, 2014, **FNU LNU, a.k.a. "Patrick Moore,"** sent his mother, **Angela Booth**, to pick up the pills from Cornelius Robinson at a location in Missouri City, Texas.

93.     On or about February 20, 2014, in Missouri City, Texas, Cornelius Robinson met with and delivered pills to **Angela Booth**.

94.     On or about February 20, 2014, in Houston, Texas, **Angela Booth** possessed 500 30mg oxycodone pills and $17,000.

95.     On or about February 20, 2014, **Jason Edgecombe** and Cornelius Robinson negotiated the price of 30mg oxycodone pills.   **Jason Edgecombe** told Cornelius Robinson that he paid $2000 for 115 pills, which equaled $17.39 per 30mg oxycodone pill.   Cornelius Robinson responded by offering **Jason Edgecombe** another 180 pills for $18 each.

First Superseding Indictment - Page 21

96.     On or about February 21, 2014, shortly after 1:00 am, **Angela Booth** called **FNU LNU, a.k.a. "Patrick Moore,"** and told him that she had been caught.

97.     On or about February 21, 2014, T.C. advised Cornelius Robinson to change where he does business to avoid detection from law enforcement.

98.     On or about February 24, 2014, acting at the direction of Cornelius Robinson, Shane Barron drove **Ivery Myers** to Brady, Texas, and San Angelo, Texas, to obtain controlled substances from specific pharmacies.

99.     On or about February 24, 2014, at the pharmacy that Cornelius Robinson specified in Brady, Texas, **Ivery Myers** presented a prescription issued to an individual named Tracy Smith and obtained approximately 120 30mg oxycodone pills that had not been prescribed for him and for which he had no legitimate medical need.

100.    On or about February 24, 2014, after obtaining the oxycodone in Brady, Texas, **Ivery Myers** and Shane Barron conspired to conceal the crime by transferring the oxycodone from the prescription bottle labelled for Smith into a prescription bottle issued for Shane Barron and disposed of the original bottle.

101.    On or about February 24, 2014, Cornelius Robinson directed Shane Barron and **Ivery Myers** to go to a particular pharmacy in San Angelo, Texas, to fill another prescription for controlled substances.

102.    On or about February 24, 2014, Shane Barron and **Ivery Myers** chose a different pharmacy, where **Ivery Myers** unsuccessfully attempted to fill another prescription for oxycodone at a pharmacy in San Angelo.

103.    On or about February 24, 2014, as a result of a traffic stop in San Angelo,
Texas, Shane Barron and **Ivery Myers** were found in possession of approximately 120
30mg oxycodone pills for which they had no legitimate medical need.    In addition,
Shane Barron and **Ivery Myers** were in possession of an empty prescription pill bottle for
120 30mg oxycodone pills in the name of **Ivery Myers**, three signed prescriptions for
120 30mg oxycodone pills issued to three other individuals, copies of the driver's
licenses for those three individuals, and a copy of Tracy Smith's driver's license.

104.    On or about February 26, 2014, **Adrian Banks**, who delivered and
distributed controlled substances obtained from Cornelius Robinson, told Cornelius
Robinson that he was running patients that day in Dallas and wanted to know if a patient
could use a green card as a means of identification at a pharmacy.

105.    On or about March 1, 2014, in Beaumont, Texas, **Carolina Berrio**
possessed approximately 150 30mg oxycodone pills in a prescription bottle in her name
that she had not received from a practitioner but had instead received from Cornelius
Robinson.

106.    On or about March 5, 2014, in Houston, Texas, **Taneisha Nickerson**
coordinated with Cornelius Robinson to deliver 225 30mg oxycodone pills.

107.    On or about July 29, 2014, in Houston, Texas, **Fahim Khan** met with an
undercover special agent of the Drug Enforcement Administration ("UC-2"), who was
posing as a script ring leader, to discuss the business of obtaining and distributing
Schedule II controlled substances by setting up clinics.

First Superseding Indictment - Page 23

108.   On or about July 29, 2014, **Fahim Khan** told UC-2 that he did business with one person who can bring twelve bodies.   **Fahim Khan** said that he wanted physical bodies with identification and medical records.   **Fahim Khan** suggested white or Hispanic patients because black patients arouse suspicion.   **Fahim Khan** further said that he had someone who would create the medical records if UC-2 could provide a name and date of birth to him.   **Fahim Khan** said the medical records were fake.   **Fahim Khan** also told UC-2 that he wanted to work three days a week and see 40 to 50 patients. **Fahim Khan** recommended against being greedy and keeping a low profile.   **Fahim Khan** said he had been in the business for 12 years.   Finally, **Khan** said that for a year and a half he worked with a clinic in south Dallas called **McAllen**.

All in violation of 21 U.S.C. § 846, the penalty for which is found at 21 U.S.C. § 841(a)(1) and (b)(1)(C) and (b)(1)(E).

Counts Two through Twenty-Two
Unlawful Use of a Communication Facility
(21 U.S.C. § 843(b))

109.    Paragraphs one through 108 are realleged and incorporated here.

110.    On or about each of the dates and approximate times set forth below, in the Dallas Division of the Northern District of Texas and elsewhere, **Sina Athari, Carolina Giselle Berrio, Angela Moore Booth, Glenda Cane, Lashavia Shyneice Denson, Jason Edgecombe, Darlene Viola Fortenberry, Candis O'Shaea Lewis, FNU LNU a.k.a. "Patrick Moore," Ivery Myers, Taneisha Nicole Nickerson, Shalisa Shaunta Robinson, Markii Josett Shular, Tasmin Jamal Stewart, Cy Viator, Adrian Banks, Brandon Dunbar,** and **Kumi Frimpong,** did knowingly and intentionally use a communication facility, namely, a telephone, in facilitating the commission of any act or acts constituting a felony under 21 U.S.C. § 846, that is, Conspiracy to Distribute a Controlled Substance set forth in Count One of this indictment and incorporated by reference here:

| Count | Defendants | Date | Time |
|-------|------------|------|------|
| 2 | **Cy Viator** | October 20, 2013 | 17:41 |
| 3 | **Tasmin Stewart** | October 21, 2013 | 12:55 |
| 4 | **Candis Lewis** | October 21, 2013 | 14:12 |
| 5 | **Markii Shular** | October 22, 2013 | 15:41 |
| 6 | **Sina Athari** | October 31, 2013 | 20:22 |
| 7 | **Lashavia Denson** | December 13, 2013 | 22:05 |
| 8 | **Darlene Fortenberry** | December 16, 2013 | 13:31 |
| 9 | **Darlene Fortenberry** | December 17, 2013 | 13:13 |
| 10 | **Carolina Berrio** | December 18, 2013 | 20:36 |
| 11 | **FNU LNU a.k.a. "Patrick Moore"** | February 18, 2014 | 14:07 |
| 12 | **Angela Moore Booth** | February 20, 2014 | 21:44 |
| 13 | **Jason Edgecombe** | February 20, 2014 | 16:54 |

| 14 | "Patrick Moore," Angela Moore Booth | February 21, 2014 | 01:13 |
|----|-------------------------------------|-------------------|-------|
| 15 | Glenda Cane | February 14, 2014 | 19:06 |
| 16 | Shalisa Robinson | February 18, 2014 | 10:41 |
| 17 | Ivery Myers | February 25, 2014 | 00:19 |
| 18 | Taneisha Nickerson | March 5, 2014 | 13:46 |
| 19 | Kumi Frimpong | November 7, 2013 | 15:27 |
| 20 | Kumi Frimpong | November 16, 2013 | 21:57 |
| 21 | Brandon Dunbar | December 15, 2013 | 16:57 |
| 22 | Adrian Banks | February 26, 2014 | 12:43 |

All in violation of 21 U.S.C. § 843(b).

<u>Forfeiture Notice</u>
(21 U.S.C. § 853(a))

111.    Pursuant to 21 U.S.C. § 853(a), upon conviction for any of the offenses alleged in Counts One through Twenty-Two of this indictment, **Sina Athari, Carolina Giselle Berrio, Angela Moore Booth, Glenda Cane, Lashavia Shyneice Denson, Jason Edgecombe, Darlene Viola Fortenberry, Bertha Alicia Garcia, William Hopkins, Fahim Ahmed Khan, Candis O'Shaea Lewis, FNU LNU a.k.a. "Patrick Moore," Ivery Myers, Taneisha Nicole Nickerson, Shalisa Shaunta Robinson, Markii Josett Shular, Tasmin Jamal Stewart, Cy Viator, Richard Andrews, Adrian Banks, Brandon Dunbar, Muhammad Faridi, Kumi Frimpong**, and **Ndufola Kigham**, defendants, shall forfeit to the United States any property constituting or derived from proceeds obtained, directly or indirectly, as a result of the respective offense and any property used, or intended to be used, in any manner or part, to commit or to facilitate the commission of the respective offense.

A TRUE BILL

_____
FOREPERSON


JOHN R. PARKER
UNITED STATES ATTORNEY


_____
MARY F. WALTERS
Assistant United States Attorney
Texas State Bar No. 24003138
1100 Commerce Street, Suite 300
Dallas, Texas   75242-1699
Telephone: 214.659.8685
Facsimile: 214.659.8803

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE UNITED STATES OF AMERICA

v.

SINA ATHARI (2), CAROLINA GISELLE BERRIO (4)
a.k.a. "Carolina Slocum Berrio",a.k.a. "Karrie"
ANGELA MOORE BOOTH (5), GLENDA CANE (7)
LASHAVIA SHYNEICE DENSON (8 ) a.k.a. "Shae Denson"
a.k.a. "Shay Denson", JASON EDGECOMBE (9)
DARLENE VIOLA FORTENBERRY (10), BERTHA ALICIA GARCIA (11)
WILLIAM HOPKINS (13), a.k.a. "New York", FAHIM AHMED KHAN (14)
CANDIS O'SHAEA LEWIS (15), FNU LNU (16) a.k.a. "Patrick Moore"
a.k.a. "Crowley", IVERY MYERS (17), TANEISHA NICOLE NICKERSON (18)
a.k.a. "Nookie", SHALISA SHAUNTA ROBINSON (20) a.k.a. "Shalisa Speed"
MARKII JOSETT SHULAR (21),  TASMIN JAMAL STEWART (22)
a.k.a. "Taz", CY VIATOR (24), RICHARD ANDREWS (25)
ADRIAN BANKS (26), BRANDON DUNBAR (27)
MUHAMMAD FARIDI (28), KUMI FRIMPONG (29)
NDUFOLA KIGHAM (30)

SEALED SUPERSEDING INDICTMENT

21 U.S.C. § 846
Conspiracy to Distribute a Controlled Substance

21 U.S.C. §843(b)
Unlawful Use of a Communication Facility

Forfeiture Notice
18 U.S.C. §853(a)

22 Counts

A true bill rendered

----------------------------------------------------------------------------------

DALLAS                                                              FOREPERSON

Filed in open court this __1st__ day of December, 2015

----------------------------------------------------------------------------------------------------
_____ Clerk

**SEALED Arrest Warrants to be issued for** RICHARD ANDREWS (25), ADRIAN
BANKS (26), BRANDON DUNBAR (27), MUHAMMAD FARIDI (28), KUMI
FRIMPONG (29) and NDUFOLA KIGHAM (30) only

----------------------------------------------------------------------------------------------------
UNITED STATES DISTRICT/MAGISTRATE JUDGE _____

Criminal Case Pending 3:15-CR-00044-D